Good morning. I am Thomas Nelson. I'm an attorney for the appellants here. I would like to reserve five minutes for rebuttal. There are two NGOs that are plaintiff appellants here. They are the Iran Thalassemia Society, which is an individuals who are afflicted with the genetic disease of thalassemia. Thalassemia is a blood disease that basically causes the body not to be able to produce hemoglobin. There's an easy fix for that. Individuals with thalassemia can get blood transfusions, and that is the common response to the disease. But over time, repeated blood transfusions will result in a lot of iron in the body and can lead to iron toxicity. And so there are drugs available that can reduce that iron toxicity and allow the individual to survive. If the iron toxicity increases too far, the various organs, the endocrine system, the heart, etc. There are drugs available that will, again, reduce the iron toxicity, but many individuals, particularly in Iran, are not able to use the Iranian drugs, Iranian-produced drugs, because of problems that their body won't accept it or there's enormous side effects. And the drug that will save those individuals is produced by Novartis, a company in Switzerland. And so those drugs are essential to those people that have thalassemia. The second disease is epidermolosis bullosa, or called EB. It's called the butterfly disease because it makes the skin exceedingly fragile, and the skin can be broken by just the slightest touch or even just by heat. It is a genetic disease, and so the individual is born with it. And the children and the toddlers and the babies that have it, they need dressings to take care of that disease. Right, counsel. I think the issue here, I mean, obviously, the medical struggles create very don't you have a serious standing problem? Because there are, within the regulations and statutes, humanitarian carve-outs. So can you get right to the legal issue and establish, or argue to us, how you can overcome the standing problems that the district court pointed out? Certainly, I'll jump right to that. The district court statement was that the, quoting, plaintiff's injury is not fairly traceable to OFAC's actions, but rather to the speculative fears of the third-party banks. That is basically the summary of what's involved here. And the question arises from that, well, if that's so, what are they afraid of, the third-party banks? And I think the answer is manifest, is that they're afraid of the Office of Foreign Assets Control Regulatory Authority. In its decision, the court... Is their fear enough? Yes, it is enough to provide, to prove indirect causation. Yes, the fear of regulatory authority is enough. I'll get to that and explain how that works. But first, I want to criticize the opinion for using a citation to that statement, and citing the two cases involving fear. And those two cases are Clapper v. Amnesty International and Sachs v. Office of Foreign Asset Control. Both cases are not causation cases. The issue here was, do plaintiffs have standing to show because of causation? It's not injury in fact. The two cases of Clapper and Sachs are injury in fact cases. They are not causation cases. Let's look at causation, setting aside whether the facts directly map onto your situation. I'm looking at the allegations in the second amended complaint, and I'm talking specifically now about the Iran Thalassemia Society, paragraph 18 through 27, really, of the second amended complaint, talks about how the... It seems to me that the scope and complexity of the maximum pressure sanctions, right, that's motivating the banks not to want to engage in these transactions, but also because fees and of this is really a complex area here. We're not quite sure what the scope of the sanctions is, and it's not worth it because the fees are just too low to engage in these transactions. So therefore, we're not really going to engage. So essentially, the economic factors play a critical role in the third party banks' refusal to engage in these transactions. That's kind of the tenor of the allegations, and that's why I'm concerned that you don't have enough here to establish causation. Well, we had enough here to have the banks withdraw completely from the provision of financial services to get these licenses. But I think what Judge Wynn is saying, if they make a business decision on their own, that this just isn't, it's not a business, it's too risky, they don't get it, there's not enough revenue from it. It seems to me you have to tie their withdrawal. The court's saying, I mean, what is your strongest factual link, tying action or inaction by a foreign bank or manufacturer to a specific statement by the OFAC? If it's just a business decision, that doesn't get you there. Your Honor, the point is that prior to the OFAC sanctions, which we as a State are illegal, that's in the briefing, prior to that, there were no problems that these drugs were coming into Iran, and even for the minimal amount that they get. Okay. But the fact that they're passed and the banks make a business decision that they just don't want to, they don't want to deal with this anymore, they feel that it's too risky, too much exposure for them. How does that, how does that get you there? That gets us there because that business decision was coerced by the sanctions that are illegal. But for the sanctions, that business decision would not have been made. Instead, they would have continued to provide drugs, the necessary drugs, the life-saving drugs to Iran. They didn't, and over 640 individuals, thalassemia patients died. That's how it gets us there. Let me go to another point, too. You mentioned coercion. Can you point out to what documents you're relying on to demonstrate coercion? What document? Yeah, it's in the complaint. The statement in the complaint is that when the FERC imposed those sanctions in November of 2018, there was an immediate cessation. That's an allegation. Immediate cessation of delivery of those goods and those medicines. There's another part of this case. That's why I go to the complaint, the allegations in the complaint, which talks about the concern because of the scope and complexity of the pressure sanctions and because the normal fees are too low, making it not economically worth it, essentially, for the banks engaged in these transactions. It seems like it's driven, at least in part, by economic concerns. This is the second amended complaint that we're talking about here. There was no opportunity to amend. Do you have anything else that you can allege, or are you standing on the second amended complaint's allegations? There's another part of that. To do what? To prove causation? Yes. There's this ER44 letter in the record that basically doesn't talk about that because the banks were not the operating fact. In this case, in the case of EB Home, EB Home needs dressings from Sweden. And those dressings were no longer delivered once the sanctions came in. And the question is, were banks involved in that decision? And the answer is no. Banks had nothing to do with that, and that is not discussed in the district court's opinion. We didn't sandbag the district court on this. This is again ER44, and it's mentioned in paragraph 5. So wait a minute. Are you saying you could — you're saying amendment would be futile? Amendment of what? Your complaint. It's not necessary. I see. And could you also just focus for a moment on the prior question in terms of what do you contend is the temporal proximity between the release of some of these documents that you're contesting, the 2019 release and some dates, and the decision-making by those whom you contend were influenced? It was immediate and industry-wide. Immediate and industry-wide when President Trump said we are going to put back in all the sanctions that were suspended under the JCPOA, and we are going to extend them for the first time ever to humanitarian aid, all of the banks that previously under the prior sanctions that had participated in the delivery of medicines withdrew. They stopped. And let me — and not just the banks, the suppliers as well, and transportation companies. And it was immediate. And let me read you this one paragraph from this letter in ER44. This is a letter from Moniki Healthcare, which is in Sweden, that provides the essential dressings for children to avoid trauma when their dressings are changed. It is a unique dressing and very important. And Moniki Healthcare said, we will not provide any more dressings to Iran. And here's what they said. Unfortunately, due to the U.S. economic sanctions — third paragraph — U.S. economic sanctions in force, Moniki Healthcare have decided not to conduct any business in relation to Iran for the time being. This also applies to business conducted under any form of exemption to the U.S. economic sanctions. We are constantly monitoring the situation and hope to be able to support your need in the near future. Not mentioned, not discussed in the opinion. Clear causation, direct causation. OFAC sanctions came in. Moniki went out. Immediate. They will not sell to Iran. OK? And we're going to address briefly redressability here. I'm not sure that gets you as far as you want to go, because the letter itself, on the one hand, says, due to U.S. sanctions, we're not going to conduct any business. But then it also says, now this includes businesses under any form of exemption. So it seems like they understood that there were exemptions. They just decided to withdraw from the market because it's not worth it anymore to deal with the sanctions issue, to try to figure out what the scope of it is. So I think that the letter cuts both ways. And with respect, I don't agree. But I mean, that statement about exemptions is an indication that under no circumstances, so long as the sanctions are in place, will they deal with it? Because they become susceptible to OFAC authority. And back again to that point, OFAC has plenary authority. And that is where the fear is coming from in the banks. And that is where Moniki's fear is coming from. And let's talk a little bit about that. What is the scope of OFAC's authority over banks? It is plenary. The Department of the Treasury has the authority to reject participation by entities that violate U.S. sanctions, reject them from the U.S. banking system. That is a death sentence to a bank. And to drive that point home, in 2014, there was such a bank that did that, that evaded U.S. sanctions and got caught at it. And undoubtedly under a statement to that bank that we're going to keep you out of the banking system, that bank, it's BNP Paribas in France, agreed to pay to the U.S. Department of in order to resolve the issue and continue having access to the U.S. markets. So therefore, the regulatory authority is extremely strong. I want to jump ahead to a case decided by the Ninth Circuit just last June, less than a year ago. And their question was, how do we determine, this is addressing only thalassemia, because our statement, our standing on this Malnicki issue is that it's a direct causation, so it's not an issue of indirect. But this court said in indirect causation, it is, it is, exists if there is, if the defendant, which in this case, Olsak, has clear regulatory authority, end quote, over the third party that's involved. Okay, that's out of Wild Earth, Wild Earth Guardians versus U.S. Forest Service, it's 74th 1212, and just, just got released. So there is clear regulatory authority, and the existence of that clear regulatory itself, authority itself, allows there to be indirect causation. There's another point here. You're at four and a half minutes. If you want to reserve time, you might want to do it now, but that's up to you. Okay, Your Honor. I want to say briefly that there's one other point, and that's that the Olsak put out a release in 2019 saying that, saying to the banks, we understand you are no longer providing medicines. We will agree that we will not impose sanctions on you. We'll give you a safe harbor from our sanctions if you do the following, and the list of things, including monthly reports to Olsak, to Treasury, et cetera, et cetera, et cetera. The point of that is, why would they do that if the cause of the bank's authority? They will offer to not impose sanctions if, if the banks will agree to these, these conditions. Well, that's not what the law says. The law says, Mr. President may not impose economic sanctions on humanitarian aid to Iran, period. Okay, I will reserve the rest of my time for rebuttal. Thank you. Good morning. Good morning, Your Honors. May it please the Court. I'm Josh Koppel for the Office of Foreign Assets Control. Plaintiff's theory of standing is that Iranians can't access medicine and medical devices because OFAC has imposed or threatened to impose sanctions on the transactions of humanitarian goods. But plaintiffs can't identify a single regulation that prohibits companies from engaging in such humanitarian transactions, nor can they identify a single instance in which a company or bank engaged in a transaction or wanted to engage in a transaction, and OFAC imposed or threatened to impose sanctions. So why don't we get right to the chase? I think that your, your friend on the other side pointed to a letter that was from the Swedish manufacturer, and I think Judge Wynn said, well, there's a couple of ways that you could look at that. I guess, I think the way he's asking, hypothetically, if plaintiffs had a letter from a foreign manufacturer or a bank that stated, in essence, that but for OFAC's FAQ 630 or FAQ 637, it would provide medicine or facilitate the provision of medicine to Iran, would plaintiffs have standing done? I think that would be a closer case, but it's telling the plaintiffs don't have a letter like that, and that the letter that they do have simply recognizes that there are exemptions permitting human, there are exemptions to the economic sanctions, but stating that nevertheless, Monlika Healthcare will not, will not engage in humanitarian transactions. I want to clarify. Well, I agree that that letter doesn't say that, but if they had a letter that said that, would that be enough, or is it never going to be enough? I think that would be a closer case, but it's important to understand what FAQs 630 and 637 are talking about. So first of all, there are broad exemptions for humanitarian transactions. There is a narrow prohibition, which is that companies, banks cannot engage in humanitarian transactions that involve an entity that has been designated in connection with Iran's support for international terrorism or proliferation of weapons of mass destruction. And that's a relatively narrow prohibition, and plaintiffs have not been able to tie that prohibition, so have not shown that that narrow prohibition caused their injury, nor that an injunction would redress their alleged injury. And that's because healthcare companies and other organizations are already authorized to provide humanitarian aid to Iran using non-Iranian banks or using Iranian banks that have not been designated in connection with support for terrorism or proliferation of weapons of mass destruction. And it's simply not plausible to think that companies aren't engaging in permitted humanitarian transactions because they can't work through particular banks that have been designated as essentially the worst of the worst, or that they would start engaging in those transactions if they were permitted with all those banks. Is it that there's just not enough economic incentive for banks to do that? I found the UN Special Rapporteur report really interesting because it seems like the problems are real, right? There is a, on the books, the humanitarian carve-out, but due to the complexity of the system, people have been discouraged or deterred from really engaging in these transactions. It doesn't seem like it's really worth it for them to do that, whether it's due to economic disincentives or otherwise. So what the plaintiff is asking for, and I think they do have a serious standing problem. That's my view. We haven't conferenced the case. But it seems to me that if they're asking for injunctive relief, clarification from OFAC to say, look, this is the scope of the sanctions. I don't see a downside for the government to do that. Informally speaking, there's got to be, I don't know what extent there's been a dialogue outside of a lawsuit or not, but it seems like there's really no downside for the government to clarify, maybe not to the exact extent of the injunctive relief that they're seeking, but certainly to make this a less complex regime. What are your thoughts on that? I think that OFAC has clarified this. And if you look at the current FAQs, 823, for example, 844, these FAQs say that U.S. persons and non-U.S. persons do not risk exposure under the U.S. sanctions for engaging in humanitarian transactions, so long as those transactions don't involve entities that have been designated in connection with support for terrorism or proliferation of weapons of mass destruction. So OFAC has clarified that. OFAC also then — where humanitarian groups then do get designated as giving material aid to terrorism or something like that, but it doesn't happen overnight. So what if the fact that banks and organizations are afraid that it could happen, they don't know that, but it could happen, so they just want to wash their hands of it. Is that — does that show — is that any evidence for someone to get standing here? No, that doesn't support standing. And it might be helpful to also think about in terms of redressability. What could plaintiffs obtain, even if they had standing and even if they showed — they'd have to show some kind of violation. But what they're asking for is essentially a declaration of what the law already is, which is that companies can engage in humanitarian transactions so long as they don't engage with entities that have been designated in connection with support for terrorism. That's not going to provide any additional clarity. It may be — and it is the case that certain — well, first of all, there are humanitarian transactions with Iran, maybe not as many as plaintiffs want, maybe not with — for these particular medicines. There are — there is humanitarian aid going to Iran. I'll say that. And, you know, but it may be that there are companies that have said it's not worth the reputational risks, right? Iran is now, again, it's essentially a pariah state, right? It has demonstrated that it supports international terrorists. And there are companies that say it's not worth the reputational risk, it's not worth compliance costs, because there's no way that we can get out of, you know, the general non-humanitarian, you know, sanctions, right? There's no challenge to those. So companies will certainly have to have some kind of compliance mechanism to ensure that they stay within the humanitarian exemptions. And there may be companies and banks that say it's not worth it. But that is not a — that decision is not caused by the alleged action of OFAC here. And so that's why plaintiffs don't have standing. Some of the things that you've been discussing are based on your information. Is this an issue that should be determined after some discovery? Should it be determined on other than a motion to dismiss? No. Plaintiffs have not alleged any factual — there are no factual allegations in the complaint that tie OFAC's — that tie any conduct of OFAC to the alleged injury. So plaintiffs have not identified, again, a single regulation — I think they're trying to say circumstantial evidence of — they come out, OFAC speaks, and then they're cut off. So it's a little bit like, I would say, like an employment law. You complain, you file a complaint, and the next thing you know, you get transferred. So, yes, the employer doesn't say, I transferred you because you filed a complaint. But they're allowed to argue that there's a temporal relationship when things happen. And I heard — I heard the appellant's lawyer saying, well, it was this way, OFAC comes out, then it's this way. So that should be enough. What's your response? Yeah. What happened that they say — and the complaint says this — is that prior to the maximum pressure sanctions, there were humanitarian transactions. After the maximum pressure sanctions, there were not. The problem is that plaintiffs aren't challenging the maximum pressure sanctions writ large. And so it's true that the imposition of economic sanctions after the withdrawal from the JCPOA did, you know, diminish economic activity, economic transactions with Iran. But that's not what plaintiffs are challenging. And so that's not enough to establish that the challenge conduct is a cause of plaintiff's injury. It's notable that the withdrawal from the — the imposition of maximum pressure sanctions occurred in May 2018. The FAQs that they cite, 630 and 637, those weren't issued until about six months later. The financial channels document that they say is relevant wasn't issued until the following year. So, you know, they make these temporal arguments. But in fact, those actually preceded the specific documents that now they rely on to argue that what caused their injury is actually some kind of threat about humanitarian transactions specifically. And again, there was no threat. They haven't identified such a threat. But their temporal allegations don't back up their conclusions either. I also want to make note that this narrow prohibition that's in FAQs 630 and 637 about working with entities that have been designated in connection with support for terrorism. If you look at OFAC's list of specially designated nationals, and on that list we explain this on page 35, footnote three of our brief, there's a list of entities that have been designated and there are program tags. And companies can identify which entities have been designated in connection with support for terrorism. If you look at Iranian banks, there are approximately 45 to 50 banks, Iranian banks, that have not been designated in connection with support for terrorism or proliferation of weapons of mass destruction. And so if Monlika Healthcare wanted to engage in humanitarian transactions with those Iranian banks, or of course with non-Iranian banks, they could do that. And so any allegation that Monlika Healthcare is not engaging in those transactions because of something OFAC is doing just doesn't rise to a level of plausibility, nor can the court conclude that if an injunction were to issue allowing Monlika Healthcare to also work with perhaps some other banks that have been designated in connection with support for terrorism, that that would cause Monlika Healthcare to actually engage in those transactions. Is there any difference in the analysis of the Thalassemia Society and then there's the other disease that's the Swedish group? Is there any difference in the analysis of the two? Do you see a difference in strength of their nexus? No. Plaintiffs have said that in some cases it's the healthcare companies itself, Monlika Healthcare, that has expressed a desire, a reluctance to do business with Iran, and in some cases it's the intermediary banks. But in either event, those decisions are not traceable to OFAC. There's no allegations tracing those decisions to OFAC. And so the analysis, the standing analysis, is the same. I'm happy to answer any other questions the Court might have. Otherwise, we ask that this Court affirm the judgment below. All right. Thank you for your argument. Thank you. Thank you, Mr. Koppel. Once again, may it please the Court, the people, the defendants are asking for facts, and will they do this? This is a motion to dismiss. The facts are expected to be there. In a motion for summary judgment, we produce facts. I think on that understanding of what's going on here, that should be sufficient to get past this at any event. Again, people were not staying alive because they were getting the things they needed, and it was that one factor that Congress said three times, don't put sanctions on humanitarian aid, and in two of those occasions, on Iran. Okay? That was part of the National Defense Authorization Acts of 2011 and 2013. The prior one was a statute that basically talked about trade and trade sanctions, and it's in the briefing. He says banks are the worst of the worst. I would contest that as a factual matter, because actually, there's a lot of small banks in Iran. Actually, the major banks of Iran do the international transactions, and not, I don't know, community savings things, that sort of thing. They're the ones that are really worried about this. The statutes that I mentioned do not authorize conditioning exemptions to putting sanctions on humanitarian aid to Iran. It's that simple. What happened here broke the law, clearly. Okay? Whether it's a direct causation, as in the case of Monique, or indirect causation, in both cases, it's clear that there was something that OFAC did that caused this to happen. That's about all I have. I just want to make this point that many, many people have died, 640, last count of thalassemia patients. Children today, it's continuing, because sanctions are in place, notwithstanding President- We're never unsympathetic to that, of course. I think that all the people that I work with, I know we certainly are sympathetic people to that, but we do have to make legal analysis, too, that sometimes not everything fits into the easiest boxes. So I certainly, I know that my colleagues, everyone certainly never wants any children or anyone to die. Understood, and I appreciate that, but let me point out that the defendants said that Iran's a pariah state. That stain is affecting people that are completely innocent, that have done step further. They're from tribal areas. How do I know that? Because it's a genetic disease, and genetic diseases normally happen in tribal areas because of intermarriage. In any event, I appreciate your time and attention. Thank you. Thank you both for your argument. This matter will stand submitted. Thank you, Mr. Nelson. The court will be in recess until tomorrow at 9 a.m. All rise.
judges: CALLAHAN, NGUYEN, Kronstadt